To get started, I want to note one adjustment in the calendar. The case that has been listed second on our agenda for today, Carmody v. Board of Trustees of the University of Illinois, will be heard last today and everything else will move up one notch. So the Kaufman case, for example, will be the second case argued today. Our first case is Golla v. Office of the Chief Judge of Cook County. Mr. D'Alba. Good morning, Your Honors. May it please the Court. I am Joel D'Alba, representing Mr. Golla, and I'd like to reserve three minutes for rebuttal. The relevant evidence in this case, under the model created under Ortiz, consists of a white man with a lot of experience, a legal background, law degree, college education, doing essentially the same jobs as a black man without the same amount of education, no background in law, no background in legal training. They had the same job titles as listed in the directory of the Office of Social Services of the Office of the Chief Judge. That was known as administrative assistant. Mr. Golla was listed as a law clerk on the payroll system in grade number 14, and Mr. Taylor, the comparator of the black man, was listed as a legal systems analyst in pay grade 22. How long did he work there? Mr. Golla? Mr. Golla worked in that section from approximately 1999 to 2013, and Mr. Taylor was out of work for a period of five or six years. He had worked in the county before 2005. He came back five or six years later, and then he was placed into essentially the same position as Mr. Golla. And it's that transfer issue that is really one of the key pieces of the case. What the Chief Judge is saying is that because of a transfer policy, the wage rates that they had when they started working at the county would be the same rates that they would have when they came back to their jobs. Mr. Golla was always a grade 14. Mr. Taylor was not. Grade 14, is that something that just sort of moves up incrementally with COLAs and stuff? It doesn't move up. It just gets increased by COLAs. Whatever you want to call it. But did he ever seek a higher rating than 14? I don't know what 14 means, frankly. In terms of dollar amount, I think it was in the vicinity between $40,000 and $50,000 a year. Okay. Well, he was apparently satisfied with that over all those years. Not actually, because in 2009, he filed an EEOC charge, complaining that there was a pay disparity. A disparity of what? Between him and Mr. Taylor. Mr. Taylor was paid a grade 22, significantly more dollars. Okay. It's when he discovered that that he started... And he discovered it in a conversation with the supervisor, Ms. Whitehazard, who said, you're paid less than Mr. Taylor. And then he wrote a letter to the chief judge in which one of the paragraphs indicated a significant difference in pay. And so their justification for doing that is that when Mr. Taylor came back from employment, he had quit the job. He was unemployed for a while, couldn't find jobs. He went to work for the Secretary of State. He ran for the Illinois State Senate. Which did he do him first? He ran for the state legislature and lost, apparently. And then went to work for the Secretary of State. I believe that's the... Is that an elected office? The job he had at the Secretary of State was not an elected office. No, the Secretary of State elected. Yes. Okay. So he's gotten into politics. Yes. Got a political job. And then he said that he couldn't find a job. So for a period of five or six years, he did not work for the county. When he came back to the county... That five or six years, was he working for the Secretary of State? Not completely. It's not clear, one, how long he worked for the Secretary of State. Or number two, what his duties were. But it is clear he wasn't doing legal work of any kind. He didn't have any legal analysis work. So he came back in a job known as legal systems analyst. And he was paid at grade 22, not at grade 20. The chief judge takes the position that their jobs are frozen at where you were when you left. But it's very clear when he came back, he was paid at a 22, not at a grade 20. And their transfer policy, which is really their basis for saying this was a legitimate, non-discriminatory reason for maintaining this pay differential. This transfer policy comes to the court by way of an affidavit of Sharon Hoffman. And that affidavit forms a central part of the claim that it does not have any of the important foundational evidence that's necessary to put in evidence pursuant to either Federal Rule of Evidence 602 or FRCP 56. And so what they did was to have her, in an affidavit, state that the transfer policy froze the wages. So when you got transferred in to a job from another job, you'll be paid at the same level you were in the past. Essentially, she said, employees who transfer from other departments within the office of the chief judge keep their pay grade and are placed in a position that fills an operational need and fits the skills and abilities of the transferred employees. The district judge accepted that as the basis for the justification to have this pay difference that, through the filing of an EEOC charge, he sought to change. And his supervisor did nothing to try and alleviate that pay disparity. What was she supposed to do? Well, she could have used the job audit policy that is historical policy that is testified to by Mr. Wozniewski. The district court didn't pay much attention to that testimony about the policy. But the idea behind the policy is to create a basis upon which the county can determine whether or not the jobs are equal, whether or not they deserve the same pay. Did Mr. Gohl have such an audit of his job? No, there was no audit. As a matter of fact, Mr. Wozniewski said he did not undertake an audit, and specifically he was asked, do you think it would be prudent as the human resource officer, meaning Mr. Wozniewski, he was superior in knowledge and status within the office to Ms. Hoffman. And he said, he was asked, do you think it would be prudent for the human resource officer, such as yourself, to have knowledge of the differences of the job duties? Is that something that's typically done? The answer was, it is prudent for a human resource officer. The answer is yes, it would be prudent. So then the next question, which is the question... I'm sorry, Your Honor. I would like not to be in the rebuttal time. Before you take a break, though, I'd like to just ask you one thing. The defense has told us that other employees in the same office with comparable jobs were actually paid significantly less than Mr. Gala, and it seems that Mr. Gala had also been protected by this transfer policy when he moved into the Social Services Department. Could you address that issue? Yes. There is no transfer policy. We indicated in the appendix at A294, we asked specifically for information about the policies. The answer was there was no policy. And second, with respect to the other employees, there's no solid evidence with good foundational testimony for Ms. Hoffman as to whether she knew the duties of those employees and whether she had supervisory authority over those employees and how those employees' job duties were related to Mr. Gala's job duties. And I'd like to use the rest of my time. Thank you, Mr. Gallo. Let's see, Mr. Patterson. Good morning. You may please court. Mr. Gala's theory of this case is straightforward. He claims that he suffered from racial discrimination solely because he was paid, not paid, excuse me, the same as his African-American colleague, Mr. Taylor. Mr. Gala has presented no evidence of any racial discrimination or racial animus or anything from which a reasonable jury could infer the same. As this court said in a testament, adding together a string of nothing still yields nothing. And that's exactly what Mr. Gala has presented to this court and to the court below. So we would ask this court to affirm the district court's grant of summary judgment in favor of the defendants. He complains that Ms. Whitehead didn't, I don't know how to put it, go to bat for him because she knew of the disparity between his pay and Taylor's pay. Is that, and I started to ask, what was she supposed to do in his view? She felt no obligation to do anything. That's correct, Your Honor, and I think the operative issue here, the central question, is applying the Ortiz standard is looking at the evidence in its totality. So starting with Ms. Whitehead, it is true that when Mr. Gala raised the disparity or the differential in pay grades, that Ms. Whitehead, as you said, Your Honor, didn't go to bat for him. But it is also clear in the record in her deposition, she clearly stated that she had no authority or power over pay grades. So that is a legitimate reason that is non-discriminatory and has gone unrebutted by Mr. Gala. Well, that's all, I mean, that's his case, is Ms. Whitehead, it seems. It didn't do enough, and that was my question. What was she supposed to do? Well, apparently she probably could have taken some initiative if she wanted to, but she didn't. But that doesn't mean she had to. That's correct, Your Honor. One, she didn't have to. And two, Mr. Gala has the burden of proving that she didn't take action because of racial animus or racial discrimination. And he has failed to provide any evidence to this court that she didn't take any action solely because of racial discrimination or racial animus toward Mr. Gala. He uses this sentence, I guess, that she repeats fairly often, that people look like him. She had to fight through them for her whole career or something like that, whatever it is. And he feels that's some indication of racial, not animus, but cognizance, and that she had achieved and I suppose white people have been, she had to fight her way through white people. Whatever that implies, that seems to be what he's using as some kind of indication of animus. Agreed, Your Honor. And I think the most important thing to note about that is in his deposition, Mr. Gala clearly stated that he was specifically asked about that statement or those statements, and Mr. Gala specifically said he did not think they were racially motivated. That is crystal clear in his testimony. He says they were disgusting, they were mean, they were inappropriate, but he clearly says they were not racially motivated. So that statement provides him no comfort, nor does it provide him any evidence to suggest that the pay differential between Mr. Gala and Mr. Taylor was motivated by racial discrimination or racial animus. And we cite a number of cases in our brief that discuss statements, and the law in this circuit has clearly established that statements have to be made by a decision maker, they have to be made close in time to the complaint of employment decision, and they have to be related to the employment decision. The latter two points we're showing a little more flexibility about, but it does need to be somebody who is involved in the decision-making process. Why isn't a direct supervisor who has the ability to bump up the issue to her superiors, why wouldn't her attitude be relevant here? It wouldn't, Your Honor, for a couple of reasons. One is, again, she stated clearly in her deposition that she has no power to change or directly affect Of course she doesn't have unilateral power. That's understood, but that's rare in a lot of organizations. But let's suppose an immediate supervisor said, I'm not going to push you for a promotion because of your race. No ambiguity about it tied to the decision-making process, but that person does not have decision-making power. That would surely be evidence that would be relevant to a claim for a denial of promotion, wouldn't it? It would, Your Honor, and maybe what would be helpful, if we take a look at the Dietz case, I think that that is the case that closely analogizes to what Your Honor is stating. So when Dietz was a white crane operator and he was laid off, and he was told by his supervisor that he was being laid off because he was white and they needed more non-whites on the crane job. That's not the situation that we have here. In fact, again, we cite a number of cases where comments are made by, for example, in the Sheffick case, the chief of police made a number of racial remarks, racially tinged remarks saying that he did not want white police officers on the police force, black police chief. And the court still found that those statements were not sufficient to show discriminatory intent because of prongs two and three, that they were not made close in time to any employment decision, nor were they in reference to any employment decision. And I think that that's exactly what we have here, Your Honor. We have a situation where Mr. Gala doesn't provide any context, any time frame, or any other way for us to determine when Ms. Whitehead made those statements. And as a result, we certainly have no evidence in the record to suggest that those statements were made anywhere near the time that the pay differential was set or when Mr. Gala raised it, nor do we have. Are you familiar, counsel, with the same actor inference in employment discrimination law? Yes, Your Honor. The idea that if, let's say, a person hires a woman for a job and then fires her a year later, that he could not have been discriminating against her because of her gender. But the premise there seems to be if a person is not sexist or racist or something at time one, then he won't be sexist or racist at time two, right? That's right, Your Honor. That's in considerable tension with this notion of stray remarks and not tying a decision maker's racial or gender or other unlawful animus to a particular decision in time. We generally let that go to the jury. But I think your principal argument here, if I understand it correctly, is that Ms. Whitehead was not a decision maker. That is correct, Your Honor. There's also some indication, really I guess from your side, that there are a number of black people who had a pay grade below Mr. Gala's, and I don't know whether they had similar work or not. But is that correct? That's correct, Your Honor. There are roughly 17 employees that in the social services department that we identified that were paid significantly below Mr. Gala. They were roughly around grade 10, grade 11. Of those 17, 10 were African American. Well, I'm just not clear about that, whether that's even comparable. Probably, maybe not. But since you brought it up, that's why I was curious. Is there any indication, is the, I didn't see anything about the chief judge's race. Is that, I mean, he's got a whole lot of people under him, obviously. And he may not even know who Mr. Gala is. But I'm just curious, because he is one of the defendants. And is he, what's his race, or do you know? Chief judge is African American, Your Honor. Okay, well, I think that's where Mr. Gala is sort of saying he's, didn't go as far as to say he's one of a kind. But at the same time, he seems to be surrounded. I was just curious, in asking him, maybe he wants something to say. If he ever, before finding out about Mr. Taylor, was concerned about his own pay grade. He says he's a lawyer. He's got a, not only a law degree, but apparently he is also a practicing or at least a lawyer that has the ability to practice. So he's a qualified lawyer. And so he's trying to say he should have had more. And is there any indication that he was trying to improve himself and get a higher pay grade, other than in comparing himself to Mr. Taylor? There is not, Your Honor. There is, in fact, nothing in the record to demonstrate that Mr. Gala ever asked for or sought a promotion or sought increased responsibilities in his job or his role. He took this job in 2000, well, he was transferred into the department in 2004. And the first time he raised any issue about his salary was in 2009. And it was only in relation to Mr. Taylor's salary. So Mr. Gala made no effort to move beyond what was essentially a clerical data entry role. I see my time is up, Your Honor. Thank you very much, Mr. Patterson. How much time is left? Take three. Give Mr. Patterson a little extra time. Go ahead, Mr. Patterson. Thank you very much, Your Honor. What Mr. Gala said is that this comment was disgusting, degrading, and demeaning. That's the essence of racism. And the comment was, Vanessa, on numerous occasions, not just one straight remark, numerous occasions, said, all my life people have been standing in my way and they looked exactly like you. With respect to the question of her role in salaries, look at Mr. Wisniewski's deposition testimony at Appendix A-204 when he talked about the role of a supervisor being able to recommend pay questions. He was asked, so is it your position that someone possessing a law license in Illinois doing research would be entitled to a grade 16 job? The answer was no. Why is that? Well, the word entitled, I guess. And that's where the district court stopped the analysis, looking at the word, I guess. But it goes on to say, would have to be recommended by the person that supervised them. That's a statement that the supervisor has a role. Then on the other page, A-223, he was asked, who decides which employees are paid 22, grade 22 in the chief judge's office? He said it would have been all the supervisors throughout his past. So the supervisors have a role with respect to the recommendation of pay questions. In terms of the flexibility that the court's referring to, recall your attention to Hutt versus the city of Markham. Over a period of four years, the mayor had made statements about black officers and the hiring of black officers. That is enough because they didn't give him, meaning the white employees, raises four years later in the period 1996 to 1997, but the racist remarks occurred in 1993 to 1997. The key points, all the evidence under Ortiz are, one, racial differences, educational differences. Gallo was transferred into the department. Mr. Taylor was rehired into the department. There's no evidence about what he did at the secretary of state's office. He doesn't have a legal background. There's no transfer policy. Please look at page A-294. An admission from the chief judge. Thank you very much, Your Honor. Thank you very much, Mr. Gallo. We'll move on to the next case of the day, which as I